T.C. Memo. 2018-213

UNITED STATES TAX COURT

ROBERT A. CONNELL AND ANN P. CONNELL, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

ROBERT A. CONNELL, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14947-16, 14948-16.[1]          Filed December 26, 2018.

<u>Barry H. Frank</u>, <u>Gordon Fairle Moore II</u>, and <u>Tiffany W. Donio</u>, for

petitioners.

<u>Kirsten E. Brimer</u> and <u>Audra M. Dineen</u>, for respondent.

_____

[1]The Court granted the parties' joint motion to consolidate docket numbers
14947-16 and 14948-16 on August 8, 2017.

[*2]     MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income tax for 2009, 2010, and 2011 (years involved) as follows (all amounts are rounded to the nearest dollar):

<u>Docket No. 14947-16--Robert A. Connell & Ann P. Connell</u>

| <u>Year</u> | <u>Deficiency</u> | Penalty<br><u>sec. 6662(a)</u> |
|------|------------|------------------|
| 2009 | $169,552 | $36,701 |

<u>Docket No. 14948-16--Robert A. Connell</u>

| <u>Year</u> | <u>Deficiency</u> | Penalty<br><u>sec. 6662(a)</u> |
|------|------------|------------------|
| 2010 | $147,198 | $29,440 |
| 2011 | 1,312,943 | 262,589 |

[*3] After concessions,[2] the issue for decision in these consolidated cases is whether an award by the Financial Industry Regulatory Authority (FINRA)[3] Dispute Resolution Panel (FINRA Panel) that extinguished a debt owed by Mr. Connell to Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), should be taxed as ordinary income or as capital gain. Respondent asserts that the extinguishment constitutes cancellation of debt income and taxable as ordinary income; Mr. Connell maintains the award was for the taking of his book of business and taxable as capital gain.

All section references are to the Internal Revenue Code, as amended, in effect for the years involved, and unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[2]Pursuant to the joint stipulation of settled issues, the parties agree that petitioners are entitled to deduct certain nonpassive activity losses for 2009; Mr. Connell is entitled to deduct nonpassive activity losses for 2010 and 2011; Mr. Connell's 2011 "Smith Barney Citi Group Deferred Compensation Loss" is a capital loss; Mr. Connell is not entitled to a carryforward loss of $209,437 for 2011; petitioners are liable for the sec. 6662(a) penalty for 2009; and Mr. Connell is liable for sec. 6662(a) penalties for 2010 and 2011.

[3]FINRA is a private corporation that acts as a self-regulatory organization.

**[*4]**                                    FINDINGS OF FACT

I.     Introduction

Some of the facts have been stipulated and are so found.  The stipulation of

facts and the exhibits attached thereto are incorporated herein by this reference.

When they timely filed their petitions, petitioners resided in Pennsylvania.

Petitioners were husband and wife in 2009; they filed a joint Federal income

tax return for that year.  Petitioners divorced in 2010 and, as is relevant in this

matter, Mr. Connell filed as a single individual on his 2011 Federal income tax

return.[4]

Mr. Connell has been a financial adviser since 1974; he began his career

with Bache, now Prudential Bache.  He has been a certified financial planner since

1979.  In 1980 Mr. Connell joined the financial services firm now known as Smith

Barney, remaining there until 2009.  At Smith Barney Mr. Connell generated a

group of approximately 200 clients.  To service those clients, Mr. Connell worked

with a five-person team of brokers and assistants.[5]  By 2009 Mr. Connell and his

---

[4]The record does not indicate whether Mr. Connell filed as a single
individual for 2010.

[5]Mr. Connell's team members were employees of Smith Barney, but they
worked exclusively for Mr. Connell.  Although Mr. Connell did not have the
authority to fire a team member, management usually honored his request or

                                                          (continued...)

**[*5]** team had assets under management (AUM) exceeding $350 million. The value of the assets under Mr. Connell's direct management was $291,556,000. Mr. Connell and his team produced over $3,150,000 in "T12"[6] annual revenue for Smith Barney, with Mr. Connell's clients generating $2,609,835 in T12 revenue.[7] The size of his book of business made Mr. Connell one of Smith Barney's top financial advisers. He was first in his office and in the North Atlantic region, and in the top 20 nationally.

II.     Mr. Connell's Brief Merrill Lynch Career

In early 2009 Mr. Connell learned that Morgan Stanley intended to acquire Smith Barney. He decided to explore other employment opportunities. Merrill Lynch made him the best offer; Mr. Connell was offered their highest compensation package, called "quintille one".

---

[5](...continued)
reassigned the person.

[6]T12 is trailing revenue, i.e., fees paid to the firm for the financial adviser's services over the preceding 12 months.

[7]In 2009 another member of Mr. Connell's team (who moved with Mr. Connell to Merrill Lynch, see infra p. 9) had AUM of $54,524,000, and T12 of $473,415.

**[\*6]** On June 26, 2009, Mr. Connell signed a "relatively standard" employment agreement with Merrill Lynch. Paragraph 3(c) governed Mr. Connell's compensation (hereinafter transition compensation).

Clause (i) stated:

(a) Connell shall be entitled to monthly transition compensation payments of Forty-Two Thousand Nine Hundred Eighty and 07/100 Dollars ($42,980.07) during each month from October 2009 through June 2017. The transition compensation payments described in this paragraph are not eligible for computation of benefits (usually known as "non eligible compensation"). Connell shall cease to be entitled to the above-described transition compensation upon the termination of his employment for any reason.

(b) In the event that Connell's employment is terminated by Merrill Lynch and/or Bank of America, other than for Cause (as defined below) or in the event that Connell's employment is terminated by reason of death or disability (as defined in the Merrill Lynch & Co. Long Term Disability Plan), Connell will no longer be entitled to monthly transition compensation payments under this Agreement. Instead, Merrill Lynch agrees to pay Connell or his estate a lump sum payment equal to the remaining transition compensation payments through June 2017, less any outstanding debts Connell owes Merrill Lynch. Subject to paragraph 3(c)(v), such lump sum shall be paid as soon as practicable after the close of the calendar year after the calendar year in which the termination occurs, but in no event later than March 15 of the year after the calendar year in which the termination occurs. In the event that Connell resigns or his employment is terminated by Merrill Lynch and/or Bank of America for Cause, Connell shall cease to be entitled to the above-described transition compensation payments and will not receive any lump sum payment as described in this paragraph.

[*7] "Cause" was defined in paragraph 4 as:

i. violation of Federal securities laws, rules, or regulations;
ii. violation of any rules or regulations of any regulatory or self-regulatory organization;
iii. violation, as reasonably determined by Merrill Lynch management, of Merrill Lynch's rules, regulations, policies, practices, directions, and/or procedures;
iv. criminal conduct that could either result in Mr. Connell's statutory disqualification or could reasonably result in harm to Merrill Lynch's reputation, as reasonably determined by Merrill Lynch management;
v. a suspension, bar, or limitation on Mr. Connell's activities for Merrill Lynch by any regulatory or self-regulatory organization;
vi. violation of Merrill Lynch's policies against discrimination and harassment;
vii. failure to maintain licenses and required registrations;
viii. dishonesty in connection with Mr. Connell's employment; or
ix. failure to fulfill or to meet any financial obligations that exist between Mr. Connell and Merrill Lynch for a period of four consecutive months that occur outside the first six months of employment.

In addition to his monthly transition compensation payments, Mr. Connell was eligible to participate in Merrill Lynch's incentive compensation bonus programs.

As previously noted, Mr. Connell was to receive $42,980 in monthly transition compensation from October 2009 through June 2017. Upon his agreeing to work for Merrill Lynch, the firm lent Mr. Connell $3,637,217. To evidence the loan Mr. Connell signed a promissory note on June 26, 2009.

**[*8]** Pursuant to the note's terms, $42,980.07 was due and payable each month by Mr. Connell. However, "[f]or the convenience of the undersigned [i.e., Mr. Connell], such amount shall be deducted from the undersigned compensation from Merrill Lynch at the time compensation is paid during each month from October 2009 through June 2017." This arrangement, common to the industry, allowed Mr. Connell to receive the full amount of his transition compensation upfront, while recognizing income only as each monthly payment came due. No moneys changed hands with respect to each monthly "repayment" of the loan. The loan became immediately repayable under the following conditions: "Notwithstanding anything to the contrary contained herein, all outstanding principal and accrued but unpaid interest on this Note shall become due and immediately payable if (a) the undersigned's employment with Merrill Lynch is terminated for any reason; or (b) the undersigned becomes insolvent or files for bankruptcy."

Mr. Connell was offered this high level of compensation in anticipation of his clients' moving with him and his team to Merrill Lynch. Mr. Connell's efforts to contact his clients and persuade them to leave Smith Barney and join him at Merrill Lynch were governed by the Protocol for Broker Recruiting (protocol). The protocol is an agreement entered into by participating financial services

[*9] firms,[8] including Merrill Lynch and Smith Barney, which sets forth five specific types of information which a financial adviser may take with him when he/she leaves one financial services firm to join another:

1.  client names;
2.  client addresses;
3.  client email addresses;
4.  client telephone numbers; and
5.  types of accounts the clients maintained.

Financial advisers are prohibited from taking any other document or information with them when changing financial services firms.

Seeking to bring his clients to Merrill Lynch, Mr. Connell consulted with Merrill Lynch's attorneys to interpret the protocol. Relying on the attorneys' interpretation of the protocol, Mr. Connell brought his client information with him to Merrill Lynch and used it to contact the clients, inform them of the move, and invite them to change financial services firms.

Mr. Connell's relationship with his clients was important to him. He negotiated special terms in his employment agreement which allowed him to solicit his longtime clients (i.e., those clients who came with him from Smith Barney) if he should ever leave Merrill Lynch:

---

[8]As many as 1,400 financial services firms are signatories to the protocol.

[*10] 6. For a period of one year following the termination of Connell's employment with Merrill Lynch for any reason, Connell agrees not to solicit, or initiate contact or communication with, either directly or indirectly, any account, customer, client, customer lead, prospect, or referral whom Connell served or whose name became known to Connell during his employment at Merrill Lynch. This restriction will not apply to clients whom Connell served as a registered representative at his prior employer or who became clients of Merrill Lynch within one year after he begins employment with Merrill Lynch. In addition, if Connell terminates his employment and joins a firm that is part of the Protocol for Broker Recruiting ("Protocol") and Merrill Lynch is part of the Protocol at the time, Connell will be entitled to follow the Protocol. * * *

Mr. Connell brought his entire team to Merrill Lynch and secured for each team member a higher rate of compensation than each had received at Smith Barney. As part of the transition Mr. Connell brought various spreadsheets and documents used by his group at Smith Barney. These were developed by Mr. Connell over his years of work. Specifically, Microsoft Word documents used by Mr. Connell and his group contained historical records of telephone conversations and personal meetings with clients, and the spreadsheets used by Mr. Connell and his group contained detailed financial planning information. These Microsoft Word documents and spreadsheets were treated as Mr. Connell's personal property at Smith Barney.[9]

---

[9]Although the standard Smith Barney employment agreement stated that all
(continued...)

**[\*11]** III.     <u>Mr. Connell's Departure From Merrill Lynch</u>

Less than a year after Mr. Connell joined Merrill Lynch, their relationship collapsed.  Merrill Lynch launched an investigation, conducted by outside counsel, with respect to how Mr. Connell brought his team's Smith Barney clients to Merrill Lynch and whether he violated the protocol and/or his employment agreement.  Mr. Connell fully cooperated with all information requests made as part of the investigation, but he engaged Thomas B. Lewis as his counsel[10] to accompany him to a followup interview.  Merrill Lynch's outside counsel concluded that Mr. Connell should be issued a letter of reprimand and that thereafter the matter should be ended.

Merrill Lynch declined to follow its outside counsel's advice.  On July 27, 2010, four days before Mr. Connell's one-year anniversary with Merrill Lynch, a date which would have entitled Mr. Connell to a bonus, Deborah Shepard, Mr.

---

[9](...continued)
files were property of Smith Barney, Mr. Connell crossed out this provision in his employment agreement and this revision was approved by Smith Barney's senior management.

[10]Mr. Connell retained the legal services of Mr. Lewis in July 2010 to counsel and represent him in connection with both the Merrill Lynch investigation and the ensuing litigation.  <u>See</u> <u>infra</u> p. 12.  Mr. Lewis has represented hundreds of individual financial advisers and financial services companies before the FINRA Panel, and he has appeared as a commentator on the subjects of FINRA arbitration and employment and securities litigation in the media.

[**\*12**] Connell's manager, and Christopher Romano, a Merrill Lynch compliance officer, met with Mr. Connell in his office. Mr. Connell was "basically told that * * * [he] was going to be resigning." Mr. Connell contacted his counsel, Mr. Lewis, and asked him whether he should resign. Mr. Lewis recommended that he should voluntarily resign, which Mr. Connell did, effective immediately.

Although Mr. Connell believed there were no grounds for his termination, he realized that he could not effectively continue his employment with Merrill Lynch and that if he were fired he would be unable to gain employment at any other reputable financial services firm. When a financial adviser leaves his/her financial services firm, the firm is required to file with FINRA a Form U5, Uniform Termination Notice for Securities Industry Registration. Form U5 provides details regarding the termination of an individual's employment. Generally, reputable financial services firms will not hire a financial adviser for whom a negative Form U5 has been filed, and Mr. Connell was concerned that if he were fired a negative Form U5 would be filed.

As soon as Mr. Connell resigned, Merrill Lynch froze his account with the firm[11] and took legal action against him. On August 3, 2010, the firm filed a

---

[11]Financial advisers are required to keep their assets and money at their employing financial services firm. Mr. Connell had several million dollars in his

(continued...)

[*13] complaint against Mr. Connell as well as an emergency motion for a temporary restraining order and preliminary injunction in the U.S. District Court for the Eastern District of Pennsylvania. In a consent order signed on August 3, 2010, Mr. Connell agreed to an injunction governing his solicitation of clients and requiring him to return certain listed Merrill Lynch property. The consent order provided that it would

> remain in full force and effect until such time as either an FINRA arbitration panel renders a decision on Merrill Lynch's request for permanent injunctive relief or this Court specifically orders otherwise. * * * Pending a preliminary injunction hearing before this Court, and pursuant to the requirements of sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3-4, the parties are directed to proceed toward expedited arbitration hearings on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the Financial Industry Regulatory Authority Code of Arbitration Procedure.

Days later, on or about August 9, 2010,[12] Merrill Lynch initiated such an arbitration proceeding before the FINRA Panel. Merrill Lynch was the claimant; Mr. Connell was the respondent.

---

[11](...continued)
personal account at Merrill Lynch. As soon as he resigned, Mr. Connell's account was frozen, thus preventing him from paying for his livelihood.

[12]The parties in this matter entered a copy of Merrill Lynch's amended statement of claim, which was filed on August 9, 2010, into the record. It is unknown when Merrill Lynch filed its original claim.

**[\*14]** After Merrill Lynch commenced legal action against Mr. Connell, he attempted to put his career back together by seeking employment at another financial services firm.  He was stymied, however, because Merrill Lynch did not immediately file a Form U5 with respect to his leaving.  Form U5 is usually filed within a week of an adviser's departure, and without such a filing, normally no reputable financial services firm would have entertained his employment application.  Consequently, for a time after he left Merrill Lynch, Mr. Connell could not service his clients.

As Mr. Connell's career remained in limbo, Merrill Lynch actively solicited Mr. Connell's clients.  Merrill Lynch had Mr. Connell's former team members contact each client in an attempt to convince each client to abandon Mr. Connell and remain with Merrill Lynch.[13]  Merrill Lynch also retained Mr. Connell's Microsoft Word documents and spreadsheets, which the team members continued to use to service clients.

On August 18, 2010, nearly a month after Mr. Connell's resignation, Merrill Lynch filed the Form U5.  Under the heading "Reason for Termination" the form

---

[13]Mr. Connell's former team members were not pressured into leaving. Rather, to motivate them to remain, Merrill Lynch gave his junior partner a raise. Moreover, to motivate Mr. Connell's clients to remain with Merrill Lynch, the firm offered them reduced management fees.

[*15] stated "Permitted to Resign". Under the heading "Termination Explanation" the form states: "If the reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below". In response Merrill Lynch wrote: "Conduct resulting in loss of management's confidence, including conduct relating to the handling of customer information and lack of cooperation in the firm's review of the matter." Testifying in this Court, Mr. Lewis stated: "That's the kiss of death. Because no firm would want to hire Bob Connell with that type of a U5."

IV.     The FINRA Arbitration

        A.      Introduction

On August 9, 2010, Merrill Lynch filed an amended statement of claim, wherein it sought (1) repayment of the outstanding balance of Mr. Connell's loan, (2) damages for breach of contract, (3) injunctive relief regarding the return of Merrill Lynch property and proprietary information, and (4) legal fees and costs. Merrill Lynch asserted that the outstanding balance of the loan should be repaid because the terms of the promissory note to Merrill Lynch called for such repayment upon termination of Mr. Connell's employment.

On September 16, 2010, Mr. Connell filed an answer, affirmative defenses, and counterclaim to Merrill Lynch's claim. In the answer Mr. Connell denied all

[*16] of Merrill Lynch's claims.  In his counterclaim Mr. Connell requested that he be awarded the following:

1.  transition compensation of $3,200,000 paid when he joined Merrill Lynch;
2.  first year back end compensation of $950,000;
3.  back end compensation for years 2 to 5 of $4,600,000;
4.  lost commission compensation for 14 years of $26 million;
5.  interest on the above mentioned amounts;
6.  unspecified punitive damages; and
7.  attorney's fees, costs, and other such relief as the FINRA Panel deems equitable.

Mr. Connell's counterclaim also requested the FINRA Panel to order Merrill Lynch to:  (1) amend his Form U5; (2) release to him his portable electronic storage devices, including the information contained thereon (i.e., the Microsoft Word documents and spreadsheets); (3) provide him a spreadsheet fully compliant with the protocol; (4) unfreeze his Merrill Lynch account; and (5) provide him with replacement computers for those destroyed by Merrill Lynch.

B.    Mr. Connell's Pleadings

The issue before us involves the character of the balance of the Merrill Lynch upfront forgivable loan, $3,242,248, which was extinguished as a result of the award determination of the FINRA Panel.  Specifically, we must determine whether that award constitutes capital gain, as Mr. Connell maintains, or ordinary income, as respondent maintains.  To resolve the characterization of the award, we

[*17] focus on Mr. Connell's arguments raised before the FINRA Panel in his

filings, specifically:

1.    answer, affirmative defenses, and counterclaim (answer);

2.    respondent/counterclaimant Robert A. Connell's prehearing brief (prehearing brief); and

3.    respondent/counterclaimant Robert A. Connell's response to claimant/counterclaim respondent Merrill Lynch, Pierce, Fenner & Smith, Inc.'s prehearing brief (response to claimant).

1.    Mr. Connell's Answer

Mr. Connell's answer began by stating that the FINRA Panel should reject

Merrill Lynch's demand that he repay the outstanding balance of the upfront

forgivable loan:

> Merrill Lynch's claim for breach of contract resulting from Mr. Connell's nonrepayment of a forgivable loan should fail because, if Merrill Lynch is allowed to collect the amount allegedly remaining due under the forgivable loan, Merrill lynch will have been permitted to freeze Mr. Connell out of the financial services industry, thus receiving the entire benefit of Mr. Connell's substantial book of business, all without having to provide any compensation to Mr. Connell for that book of business.  * * *  This amount, as well as subsequent compensation and bonuses that Mr. Connell was to receive from Merrill Lynch during the first five years of his employment, was directly tied to the amount of revenue his book of business generated the year before he joined Merrill Lynch.

Continuing, Mr. Connell's answer asserted that if Merrill Lynch were permitted to

collect the outstanding balance of the upfront forgivable loan, "then Merrill Lynch

**[*18]** will have benefited from the revenues generated from Mr. Connell's entire book of business without having provided to Mr. Connell any compensation for that book of business." Further, the answer posited that requiring Mr. Connell to pay the outstanding balance of the upfront forgivable loan would amount to the unjust enrichment of Merrill Lynch.

> As previously stated, Merrill Lynch, by filing Mr. Connell's Form U5 in the manner it did, has effectively prevented Mr. Connell from securing employment in the financial services industry. By doing so, Merrill Lynch has secured its ability to solicit and reap the benefit of Mr. Connell's entire book of business free from competition. If, in addition to reaping the benefits from servicing Mr. Connell's clients, Merrill Lynch is also allowed to collect amounts allegedly due under Mr. Connell's forgivable loan, Merrill Lynch will have received the benefits from Mr. Connell (the revenues generated from his clients) without having provided any compensation to Mr. Connell for those benefits.

Mr. Connell's counterclaim consisted of 10 counts. We review only those counts that are relevant to this matter.[14]

In count I (breach of contract demanding repayment of transition compensation), Mr. Connell argued that "[b]y seeking the return of compensation paid to Mr. Connell, which was paid to Mr. Connell to induce him to transfer his

---

[14]The remaining counts were as follows: count II (breach of contract non-payment of backend compensation); count III (breach of the implied covenant of good faith and fair dealing); count IV (common law fraud and fraud in the inducement); count V (Form U5 defamation); and count VII (conversion of personal accounts).

[*19] entire client base to Merrill Lynch, after Mr. Connell had effectively transferred his entire book of business to Merrill Lynch, Merrill Lynch has breached the [employment] Agreement it entered into with Mr. Connell."

In count VI (quantum meruit, unjust enrichment, and conversion of client accounts), Mr. Connell argued that Merrill Lynch enticed him to join that firm with bonus compensation, including the $3,637,217 upfront forgivable loan. Upon Mr. Connell's departure from Merrill Lynch, the firm demanded that he pay the outstanding balance of the upfront forgivable loan. And by delaying the filing of the Form U5 and then "filing a false and defamatory Form U5, * * * [Merrill Lynch] has virtually assured that Mr. Connell will not be able to find competitive employment in the financial services industry, thereby allowing Merrill Lynch to continue to service Mr. Connell's clients, free from competition. This would unjustly enrich Merrill Lynch because the firm would hold Mr. Connell's entire book of business without having paid any compensation."

In count VIII (tortious interference with contracts and/or business relationship), Mr. Connell argued that by forcing his resignation and filing Form U5, Merrill Lynch "virtually assured that Mr. Connell would be unable to secure comparable employment in the financial services industry". As a result he "is

**[\*20]** unable to service his clients, and he is, therefore, unable to generate any revenue from servicing those clients' accounts."

In count IX (misappropriation of trade secrets), Mr. Connell asserted that the spreadsheets and Microsoft Word documents containing his client information, which he had developed over the preceding 36 years, were "trade secrets that are proprietary to Mr. Connell". Mr. Connell accused Merrill Lynch of "utilizing these programs for its own benefit" after his resignation.

In count X (unfair competition), Mr. Connell asserted that

Merrill Lynch has engaged in acts of unfair competition by luring Mr. Connell--and by extension, his lucrative book of business--to Merrill Lynch with the promise of high compensation only to, one year later: (1) force his voluntary resignation; (2) decline to provide to him his promised compensation; (3) seek to recoup compensation already paid to him; (4) file a false and defamatory Form U5, preventing Mr. Connell from securing employment in the industry; and then (5) all the while continuing to service and generate revenue from Mr. Connell's clients entirely free from competition.

### 2. Mr. Connell's Prehearing Brief

The preliminary statement to Mr. Connell's prehearing brief asserted that Merrill Lynch sabotaged Mr. Connell's career.

Interestingly, none of Mr. Connell's team, including his partner and the four sales assistants who transitioned with him, seem to have faced any repercussions for the actions in which they all engaged and which allegedly constituted violations of the Protocol. The rest of Mr. Connell's team remains at Merrill Lynch servicing Mr. Connell's

[*21] entire book of business. Forcing Mr. Connell's resignation and retaining his entire book of business was not enough for Merrill Lynch, though; instead, Merrill Lynch saw fit to seek repayment of compensation paid to Mr. Connell and to file actions against him in Federal Court and with FINRA, all in an effort to ensure that Merrill Lynch would have total, unrestricted access to Mr. Connell's book of business free from competition and to prevent Mr. Connell from securing competitive employment at a comparable financial services firm.

Continuing, the prehearing brief asserted that by "luring Mr. Connell and his lucrative book of business to Merrill Lynch" the firm took action to ensure that Mr. Connell would resign and be unable to find future work. Thus, Mr. Connell claims:

> Merrill Lynch has thereby secured for itself exclusive access to Mr. Connell's book of business, including the revenue generated by and the assets held in Mr. Connell's clients' accounts. It has done so by forcing his resignation--manufacturing an alleged violation of the Protocol for Broker Recruiting as its reason for doing so--and then filing a Form U5 Notice of Termination regarding Mr. Connell's separation with an intentionally false statement explaining the circumstances of Mr. Connell's resignation. The statement made on Mr. Connell's Form U5, which is meritless and was made without justification, render [sic] Mr. Connell virtually unemployable with the major financial services firms in the securities industry. Additionally, as if this were not enough, Merrill Lynch, since Mr. Connell's resignation, has sought the return of the very compensation paid to Mr. Connell in return for his decision to transfer his book of business to Merrill Lynch. Moreover, the manner in which Merrill Lynch has handled Mr. Connell's resignation from the firm may have irreparably damaged his relationship with his clients, who, after Mr. Connell's resignation, were left to speculate as to the true nature of Mr. Connell's abrupt departure from Merrill Lynch.

**[\*22]** Mr. Connell's prehearing brief further stated:

> By seeking the return of compensation paid to Mr. Connell, which was paid to Mr. Connell to induce him to transfer his entire client base to Merrill Lynch, after Mr. Connell had effectively transferred his entire book of business to Merrill Lynch, Merrill Lynch has breached the Agreement it entered into with Mr. Connell. Merrill Lynch's breach has caused Mr. Connell to suffer damages. Under the [employment] Agreement, Merrill Lynch is obligated "to pay and indemnify [Mr.] Connell for all expenses, including attorneys' fees and costs, incurred by [Mr.] Connell if he is successful in enforcing any of his rights under this agreement." <u>See</u> Exhibit 10, Agreement at ¶10. Therefore, Mr. Connell requests that the Panel issue an Award in his favor, along with compensatory damages, punitive damages, attorneys' fees, costs of arbitration, interest, and such other and further relief as the Panel deems equitable.

In its "Discussion of Mr. Connell's Claims Against Merrill Lynch", the prehearing brief sets forth seven arguments.

Mr. Connell's first argument was that "Mr. Connell's Claim for Breach of Contract * * * Should Be Granted Because if Merrill Lynch is Permitted to Obtain the Return of Those Funds Then Merrill Lynch Will Have the Benefit of Being Able to Service Mr. Connell's Entire Book of Business without Having to Provide any Compensation to Mr. Connell for that Benefit". With respect to this argument, Mr. Connell asserted that

> after Mr. Connell had effectively transferred his entire book of business to Merrill Lynch, Merrill Lynch has breached the Agreement it entered into with Mr. Connell. Merrill Lynch's breach has caused Mr. Connell to suffer damages. Under the Agreement, Merrill Lynch

[*23] is obligated "to pay and indemnify [Mr.] Connell for all expenses, including attorney's fees and costs, incurred by [Mr.] Connell if he is successful in enforcing any of his rights under this agreement." See Exhibit 10, Agreement at ¶10.

Mr. Connell's second argument was that "Mr. Connell's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Should be Granted Because, by inducing Mr. Connell to Transfer his Entire Book of Business only to Force his Resignation one Year Later and Avoid Paying Compensation Owed to Mr. Connell, Merrill Lynch Breached the Covenant of Good Faith and Fair Dealing Implied in its Agreement with Mr. Connell". This argument is premised on the law of contracts, positing that Merrill Lynch breached the State of Pennsylvania's[15] implied covenant of good faith by inducing Mr. Connell to transfer his entire book of business and then forcing his resignation less than one year later to avoid paying compensation owed to him.

Mr. Connell's third argument was that "Mr. Connell's Claim for Fraud in the Inducement Should be Granted [because], by inducing Mr. Connell to Transfer his Entire Book of Business only to Force his Resignation one Year Later and Avoid Paying Compensation Owed to Mr. Connell, Merrill Lynch Fraudulently induced Mr. Connell to Sign the Agreement with Merrill Lynch and Transfer his

---

[15]Mr. Connell's employment agreement with Merrill Lynch was governed by Pennsylvania law.

**[*24]** Entire Client Base to the Firm", which is related to common law fraud and fraudulent inducement committed under the auspices of Pennsylvania tort law.

Mr. Connell's fourth argument was that

Mr. Connell's Claim for Quantum Meruit, Unjust Enrichment, and Conversion of Clinet [sic] Accounts Should be Granted Because, by Inducing Mr. Connell to Transfer his Entire Book of Business to Merrill Lynch only to Force his Resignation one Year Later and Avoid Paying Compensation Owed to Mr. Connell, Merrill Lynch is Effectively Receiving all the Benefits of Servicing Mr. Connell's Entire Book of Business without Providing any Remuneration to Mr. Connell for that Benefit * * *

In making this contention Mr. Connell argued that Merrill Lynch essentially converted his book of business via a plan whereby Merrill Lynch: (1) lured Mr. Connell to join the firm with a large compensation package "the initial of which was in the amount of $3,637,217.00", i.e., the amount of the monthly transition compensation and the upfront forgivable loan that was based on the value of his book of business; (2) forced his resignation just before his first year bonus was due to be paid; (3) demanded he repay the upfront forgivable loan; and (4) filed "a false and defamatory Form U5", which "virtually assured that Mr. Connell * * * [would] not be able to find comparable employment in the financial services industry, thereby allowing Merrill Lynch to continue to service Mr. Connell's clients almost entirely free from competition."

[*25] Mr. Connell's fifth argument was that "Mr. Connell's Claim for Tortious Interference Should be Granted Because, in the Methods it has Used to Ensure that Mr. Connell Would Not be Permitted to Secure Comparable Employment, Merrill Lynch tortiously Interfered with Mr. Connell's Relationship with his Clients". Similar to the fourth argument, this argument adds a tort claim to Mr. Connell's position that Merrill Lynch converted Mr. Connell's book of business.

Mr. Connell's sixth argument was that "[b]y Continuing to use for its own Pecuniary Gain the Client Financial Planning Spreadsheets and Documents that Mr. Connell Developed, Merrill Lynch has Misappropriated Mr. Connell's Trade Secrets". With respect to this argument, Mr. Connell asserted that "[w]hen Mr. Connell resigned from Merrill Lynch, he was not permitted to retain copies of his client financial planning spreadsheets or Microsoft Word documents, and, upon information and belief, Merrill Lynch is still utilizing these programs for its own benefit."

Mr Connell's seventh argument was that "Merrill Lynch, by Forcing Mr. Connell's Resignation, by Filing a False Form U5, and by Taking Other Actions Against Mr. Connell[,] has Violated FINRA Rule 2010 and has Engaged in Unfair Competition". With respect to this argument, Mr. Connell asserted that Merrill Lynch violated the spirit and letter of FINRA rule 2010, which provides that a

**[*26]** member firm is to "observe high standards of commercial honor and just and equitable principles of trade" in conducting business. Merrill Lynch violated this rule, Mr. Connell argued, by luring him to the firm, forcing him to resign, filing a "false and defamatory Form U5", demanding he pay the outstanding balance of the upfront forgivable loan, and "continuing to service and generate revenue from Mr. Connell's clients entirely free from competition."

      3.     <u>Response to Claimant</u>

In the response to claimant Mr. Connell reiterated that he (1) was not in breach of his employment contract, (2) did not misappropriate trade secrets, (3) did not convert Merrill Lynch property, (4) did not breach his duty of loyalty, and (5) did not take unfair competitive actions. Mr. Connell further argued that Merrill Lynch's claim for breach of contract for nonrepayment of the balance of the upfront forgivable loan should be denied because it would be manifestly unjust to allow the firm to essentially freeze Mr. Connell out of the financial services industry, and permit Merrill Lynch to freely solicit and generate revenue from Mr. Connell's book of business without providing him with any compensation.

> Mr. Connell was provided with an up-front loan by Merrill Lynch as an inducement to join Merrill Lynch. The loan was based on the amount of revenue he generated the year before he joined Merrill Lynch, but, unlike the scenario described above [wherein a hypothetical financial planner leaves one firm to work at another with

[*27] an outstanding balance remaining on a forgivable loan] when Mr. Connell resigned from Merrill Lynch, he did not join a competitor and, in the several months since his resignation, has only managed to acquire 11 clients. Instead, Merrill Lynch filed a Form U5 with language that makes it impossible for Mr. Connell to find comparable employment in the financial services industry. Having effectively sidelined Mr. Connell, Merrill Lynch has been able to solicit free from competition, Mr. Connell's entire book of business. Now Merrill Lynch, through its breach of contract claim, seeks to force Mr. Connell to repay to Merrill Lynch the amounts it originally paid to him to bring his book of business to Merrill Lynch. It would be manifestly unjust to permit Merrill Lynch to continue to solicit and reap the benefits of Mr. Connell's entire book of business, without competition, and also allow Merrill Lynch to collect the amounts allegedly outstanding on Mr. Connell's up-front loan. Therefore, Merrill Lynch's breach of contract claim for non-repayment of Mr. Connell's up-front loan should be denied.

Mr. Connell further posits that Merrill Lynch's claim against him for unjust enrichment should be rejected because, among other things, if any party has been unjustly enriched, it was Merrill Lynch.

C.    Outcome of the FINRA Arbitration

On May 5, 2011, the FINRA Panel rendered its decision. With respect to Merrill Lynch's claims, the FINRA Panel stated "Claimant's [i.e., Merrill Lynch's] claims are denied in their entirety." Thus, the FINRA Panel declined to order Mr. Connell to pay the balance owing under the promissory note.

With respect to Mr. Connell's counterclaims, the FINRA Panel ruled that "[t]he restrictions on Respondent's [i.e., Mr. Connell's] personal account(s) with

[*28] Claimant are stricken. Respondent is entitled to retain the $3,285,228.26 paid by Claimant to Respondent." Thus, the FINRA Panel made it clear that Mr. Connell was not obligated to pay the balance of the upfront forgivable loan to Merrill Lynch. Mr. Connell was also awarded compensatory damages of $476,500. The FINRA Panel did not specify its reasoning or the basis of this award. Mr. Connell was further awarded attorney's fees of $288,732 and costs of $22,734.

The FINRA Panel ordered Merrill Lynch to deliver to Mr. Connell the templates for his Microsoft Word documents and spreadsheets but expressly stated that the templates were to be delivered to Mr. Connell without any data. Upon delivery, Merrill Lynch was ordered to certify that it had removed the "Connell Proprietary Excel Spreadsheet and MS Word templates from its own computer systems". The order did not prevent Merrill Lynch from retaining the substantive client information, however. Mr. Connell's request that his Form U5 be expunged was denied. The FINRA Panel further ruled that all other elements of the injunction agreed to under the consent order were to remain in effect.

Mr. Connell's victory before the FINRA Panel was, according to Mr. Lewis, "very unusual. Typically, a promissory note is awarded because there's a contract and there are terms, and the terms are fairly one-sided when the financial advisor

[*29] signs the terms. So there's an awful lot of protections for the financial institutions. So it's rare for something like this to occur."

## V.    Mr. Connell's 2011 Federal Income Tax Return

Merrill Lynch issued Mr. Connell a Form 1099-C, Cancellation of Debt, reporting debt cancellation income of $3,285,228. The parties stipulated that the amount on Form 1099-C was wrong and that the proper amount of cancellation of indebtedness income should be $3,242,248.[16]

Mr. Connell timely filed his 2011 Federal income tax return wherein he reported adjusted gross income of negative $112,635. Mr. Connell attached to his income tax return a document entitled "Form 8582 and Schedule E 2011", wherein he reported the cancellation of indebtedness income as "deferred compensation" ordinary income. He offset this amount with two ordinary loss items: (1) a "Merrill Lynch Reduction for 1099C Reported on W-2" of $42,980[17] and (2) "Smith Barney Citi Group Deferred Compensation Loss" of $2,495,732, resulting in $782,516 in total (net) deferred compensation. This amount, combined with Mr. Connell's other reported business losses, was reported on line

---

[16]Merrill Lynch issued Mr. Connell a Form W-2, Wage and Tax Statement, reporting the other awards made by the FINRA Panel.

[17]Respondent agrees that the amount listed on the Form 1099-C should be decreased by $42,980.

[*30] 17 of Mr. Connell's Form 1040, U.S. Individual Income Tax Return, as a total loss of $577,363. Combining this total with deductions of $65,999 claimed on Schedule A, Itemized Deductions, Mr. Connell requested a refund of $129,911.

The IRS examined Mr. Connell's 2011 tax return and determined that the Smith Barney Citi Group deferred compensation loss was a loss from the sale of stock and could not be used to offset ordinary income. Mr. Connell has conceded this recharacterization.

On October 10, 2013, Mr. Connell filed an amended 2011 income tax return wherein he reported adjusted gross income of $1,047,365. On line 17 of the amended tax return Mr. Connell reported positive income of $582,637. Also on the amended return Mr. Connell reported itemized deductions totaling $1,930,999. As a result, Mr. Connell again claimed entitlement to a refund of $129,911. In essence, Mr. Connell recharacterized the extinguishment of the balance of the Merrill Lynch upfront forgivable loan, $3,242,248, from ordinary income to capital gain.

OPINION

In general, the Commissioner's determinations in the notice of deficiency are presumed correct and taxpayers bear the burden of proving error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Gross income includes all income

**[\*31]** from whatever source derived unless specifically excluded. Sec. 61(a); Simpson v. Commissioner, 141 T.C. 331, 338 (2013), aff'd, 668 F. App'x 241 (9th Cir. 2016).

Proceeds received pursuant to a judgment arising from a dispute constitute taxable income unless the taxpayer can establish that the proceeds come within the clear scope of a statutory exclusion. Commissioner v. Schleier, 515 U.S. 323, 328-329, 336-337 (1995). When a solvent debtor's fixed obligation is reduced or canceled, the amount of the reduction or cancellation constitutes income. Sec. 61(a)(12); Commissioner v. Jacobson, 336 U.S. 28 (1949); OKC Corp. & Subs. v. Commissioner, 82 T.C. 638, 647 (1984).

This Court has long recognized the rule that "[t]he taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim and the actual basis of recovery." Sager Glove Corp. v. Commissioner, 36 T.C. 1173, 1180 (1961), aff'd, 311 F.2d 210 (7th Cir. 1962); see also OKC Corp. & Subs. v. Commissioner, 82 T.C. at 650; Gidwitz Family Tr. v. Commissioner, 61 T.C. 664, 673 (1974). The nature of the litigation is determined by reference to the origin and character of the claim (origin of the claim doctrine) which gave rise to the litigation. Gidwitz Family Tr. v. Commissioner, 61 T.C. at 673. Thus, to the extent that amounts received for injury or damage to capital

[*32] assets exceed the basis of the property, such amounts are taxable as capital gain, whereas amounts received for lost profits are taxable as ordinary income. OKC Corp. & Subs. v. Commissioner, 82 T.C. at 650.  In deciding the issue before us (i.e., the character of the $3,242,248 extinguished as a result of the FINRA Panel's award) the question we must answer is:  "In lieu of what were the damages awarded?"  State Fish Corp. v. Commissioner, 48 T.C. 465, 472 (1967) (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), aff'g 1 T.C. 952 (1943)), modified by 49 T.C. 13 (1967).[18]

---

[18]Respondent argues that Mr. Connell is precluded by the rule of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), from relying on the origin of the claim doctrine.  We disagree with respondent's position.

Respondent argues that Mr. Connell is bound by his employment agreement and promissory note.  The promissory note was made as part of Mr. Connell's compensation package with Merrill Lynch (i.e., the monthly transition compensation).  The note makes no mention of Mr. Connell's book of business.  Moreover, as respondent points out, Mr. Connell treated the monthly transition compensation he received during his tenure at Merrill Lynch as ordinary income, which is consistent with the terms of the employment agreement and promissory note.  Respondent also draws our attention to the fact that Mr. Connell did not assert that the income was capital gain income until the IRS determined that he erroneously characterized the Smith Barney stock loss as an ordinary loss.

The Danielson rule does not control the outcome of this matter.  Mr. Connell does not seek to change the tax consequences of a transaction by challenging the underlying agreements and reforming the contractual terms.  See id. at 775-779.

**[*33]** The FINRA Panel did not explain the basis of its award; hence, we are left to infer its reasoning. In similar cases we have looked to the pleadings to determine the nature of the taxpayers' claims. "The decided cases seem to be unanimous in holding that in such circumstances as we have here, the nature of the recovery is to be determined from the claims made in the pleadings or complaint filed in the prior action and the issues and evidence there presented to the jury." State Fish Corp. v. Commissioner, 48 T.C. at 474.

Mr. Connell argues that his filings with the FINRA Panel make it clear that the award was to compensate him for the taking of his book of business and hence should be taxed as a capital gain.

> The gravamen of * * * [Mr. Connell's] claim in the FINRA arbitration was that he was entitled to retain the unpaid portion of the Loan proceeds because they represented fair compensation for Merrill Lynch's having taken his book of business. In fact, that was the only argument he made with respect to his claim for retention of those proceeds.

We disagree. Admittedly, the filings heavily emphasize Mr. Connell's argument that Merrill Lynch lured Mr. Connell to Merrill Lynch in order to acquire his book of business and that thereafter it set out to ruin his professional reputation so as to keep him from working at a competing financial services firm. But this argument was not the only one Mr. Connell presented to the FINRA

[*34] Panel. Mr. Connell's attorney, Mr. Lewis, an experienced and successful litigator, made certain of that. Mr. Connell's filings forcefully argue that the FINRA Panel should reject Merrill Lynch's position and conclude that Mr. Connell need not pay the balance of the upfront forgivable loan. Indeed, Mr. Connell's filings emphasized that Merrill Lynch breached the terms of the employment contract, not Mr. Connell, causing Mr. Connell to suffer damages. This argument, by itself, would relieve Mr. Connell of his obligation to pay the outstanding balance of the promissory note to Merrill Lynch.

The record herein does not reveal the specific argument the FINRA Panel found most persuasive when it extinguished the balance of the upfront forgivable loan. Petitioners bear the burden of answering the question "in lieu of what were the damages awarded?" On the basis of our examination of the record, we conclude that petitioners have not met their burden to establish that the amount at issue was solely for the acquisition of Mr. Connell's book of business. Consequently, we sustain respondent's determination that the extinguishment of Mr. Connell's debt to Merrill Lynch constitutes cancellation of debt income and that the amount of the extinguishment is taxable as ordinary income.

**[*35]** To reflect the foregoing, and the concessions included in the joint stipulation of settled issues,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.